Our first case will be United States v. Clerfe, if I've got that pronounced correctly. It is 24-2166. Judge Roth, can you hear us? Here, thank you. Good morning. Good morning. Terrific. Okay, we'll hear from counsel for the appellant first. May it please the court, Stacey Fossil on behalf of Appellant Derby Clerfe. With the court's permission, I would like to request three minutes of time for rebuttal. That will be granted. Thank you, Your Honor. Derby Clerfe is a United States citizen who had a spotless criminal record until this case. The government prosecuted Mr. Clerfe for the shipment abroad of legally purchased handguns in violation of certain export laws. Ultimately, the government rests on the fact that 9mm handguns could not be exported because at that time they were included on the so-called munitions list. Mr. Clerfe's conviction cannot stand because the indictment in this case violates both the Second Amendment and the non-delegation doctrine. To begin with the Second Amendment, as step one of the Bruin analysis, the text informed by its original understanding protects the right to transfer and send firearms. That's because the Second Amendment's text covers ancillary acts that are necessary to exercise the right to keep and bear arms. Moving, transferring, and sending firearms is therefore covered. Those acts are necessary to keep and bear firearms where needed for protection of self, family, and property. The text doesn't draw distinctions between sending arms domestically versus sending arms abroad. Well, the text of the Second Amendment doesn't cover exporting at all, right? The text of the Second Amendment doesn't use the word exporting, but I think we have to look more broadly at what is covered by the Second Amendment. So, for example, the text of the Second Amendment doesn't mention purchase, but certainly laws banning the purchase of firearms would be subject to Second Amendment scrutiny. And so, likewise, I think it is plain that transfer in general has to be covered by the Second Amendment, because if the government could prohibit all transfers of firearms, that would certainly burden the right to obtain firearms in the first instance and also to keep and bear them where desired. Well, even if we should assume that you're correct that export is covered, the defendant here didn't fill out the export forms that are necessary. That would not be excused by the Second Amendment, would it? Your Honor, I think we have to look at the scheme as a whole and how it operated. That's what the court did in Bruin, and that's what this court did in Lara. And so, in this case, the government says in footnote, I believe it's six of its brief, that it's resting on the fact that those arms were on the munitions list. So, what would have happened if Mr. Clairvay had tried to fill out the export information is that it would have asked for a license number, and he wouldn't have been able to provide one because he couldn't have gotten a license because those firearms were on the munitions list. So, I do think we have to look at what the actual impact of this. It was a ban on him sending those firearms to Haiti. And even if we were just looking at the licensing, for example, licensing schemes are not exempt from Second Amendment coverage. That's what the court said in Bruin. It looked at, for example, the licensing scheme at issue in Bruin. It didn't say, do these individuals have a right to bear arms without a showing of special need? It just said they have a right to bear arms, and now we go to the second step to the history to say, is imposing a restriction to a showing of special need consistent with the history? And it held that it was not. So, I do think here transfer is covered, and then the Second Amendment doesn't draw any distinctions between domestic transfer and international transfer. You argue in your brief that there's no concern about extraterritoriality here. But, I mean, it seems to me that your argument necessarily implies that your client would have the right to keep firearms wherever he desired. That would be here or there. How do you square that? That's correct, Your Honor. And I think that's consistent with the notion that the U.S. Constitution follows the power of the U.S. government against its citizens. And so Mr. Clairefe has a right not to be prosecuted by the United States government for keeping arms in another country. Now, I'm not saying he could go to the courts in Haiti and exercise his right, or that non-U.S. citizens could raise these claims. But I think the court's case law is clear that if you're a United States citizen and the right is protected by the Constitution, it follows the government's power. And, of course, here the conduct was also in the United States. So to take the First Amendment, for example, I think it's pretty plain that the speech rights of American citizens speaking abroad could not be burdened by the U.S. government without being subject to the First Amendment. So if the government passed a law saying American citizens are prohibited from speaking ill of the United States government in other countries, that would plainly, I think, violate the First Amendment, as would a law prohibiting export of materials criticizing the government. And so I think that's clear in the First Amendment context. And the court has, of course, analogized mostly the Second Amendment context. Certainly, the government has not pointed to any case law saying that keep should be in any way restricted to domestic when we're talking about the United States government infringing on the conduct of a United States citizen through United States laws. And, of course, I also think that this broad kind of definition of transfer and exporting firearms is confirmed by the original understanding of keep and bear arms. Well, then maybe let's go to step two, then. If you say it's within the text, then the jurisprudence tells us there's a second step to look at, whether it's consistent with the nation's history and tradition of firearms regulation. And we've got this letter that you point to, Jefferson to Hammond. How does that support your argument? Yes, Your Honor. I think that it actually supports me on both step one and step two. I think in step one, we can look at the history insofar as it informs the original understanding of the text. And so I think at step one, that letter kind of helps to show that things that citizens were ordinarily able to do with their firearms included export them. That's very clear from that letter. And because the Second Amendment codified a pre-existing right, I think it should be presumed that things that ordinary citizens ordinarily and lawfully did with their firearms would be covered, unless the government can marshal evidence showing that that right was able to be burdened in certain ways. And then at step two, I think that letter just helps to put kind of when the government is marshaling its historical regulations, I think that that letter helps to put those in context and to show that they were really limited to sort of wartime measures. I think the government points to four statutes. They were short-lived, sort of extraordinary measures that were in response to international wars or conflicts and that led to imminent threats to American property. So ships being captured by the British when they were going abroad or the reason of needing to keep more firearms in the United States. And so I really don't think- Is there anything in the record that tells us why he shipped these guns to Haiti? What's in the record, Your Honor, is that he intended to ship the firearms to his family home in Haiti. The government says in their briefing below that's what he told investigators when they came to his house. And, of course, the government disputes that characterization. But looking at the indictment- He never did actually end up with them, right? He was out of Haiti by the time the guns got there. Your Honor, he did go to Haiti shortly after they had shipped. The record doesn't say this. He may have expected them to be there, but they hadn't arrived yet because it was very shortly after he had shipped them. And it is his family home there. The government, again, disputes this. But I think it's in the record that we have proffered that it's a family home that either he owns or owns collectively with his family. And the government has certainly never proffered any evidence that would suggest anything else. The most that they say is that he said some of the guns ended up possessed by his cousins and uncles. But, of course, that's not inconsistent with anything we're saying. They may have needed that to help get to his family home or they may have been in the family home. And, of course, the Second Amendment protects the right to keep and bear arms for protection of self and family. And so I think when you look at the sort of indictment in this case, it clearly sweeps in this conduct. Even if the government disputes our version of it, they have never said that he sold the firearms, that he transferred them to anyone else. The indictment listed a conspiracy because of the person that helped him ship the arms. But it never lists any overt acts that he received payment, that he intended them to go to anyone other than in his family home. And so certainly, at least as to that conduct, we think that the Second Amendment both covers that conduct by its plain text and also that the government has not pointed to any founding era regulation on the how or the why that is at all similar to these sort of extraordinary time-limited wartime measures. On Step 1, I think we've recognized in Marzarella that the Second Amendment protects the commercial transfer of arms. But does the Second Amendment require that the commercial transfer of arms be entirely unregulated? I think, Your Honor, at Step 1, Marzarella and Drummond do recognize exactly what Your Honor just mentioned. I think when we talk about regulations, that's when we then move to Step 2. And we would see, is there a historical tradition for these regulations? So certainly, there can be, I would imagine, things that the government would point to for various commercial regulations of firearms, just not the ones here. And of course, here we're not dealing with commercial transfer, but just transfer more generally. I also wanted to just quickly on the non-delegation. What do you mean by that? You just said at the end, we're not dealing with commercial transfer, but just transfer generally. I think that here, because there was no allegation that Mr. Clairfay intended to sell the firearms, this is just sort of even broader than, even more burdensome, I think, than the conducted issue in Marzarella and Drummond. Maybe it takes him out of the protection, Second Amendment protection for the commercial transfer of firearms. I mean, what's he doing if he's not commercially transferring them? Well, I think what our proffer is that he was keeping them in his family home in order to protect himself, his family. I do think, Your Honor, even if, I think the best view is that even if it was a commercial sale, that that is still covered by the Second Amendment's plain text. Because, of course, Marzarella and Drummond recognized that if the government were to entirely prohibit sales, then that would burden greatly the Second Amendment right. And I don't think that there can be any sort of, I know that, for example, the Ninth Circuit has used sort of like a meaningfully constrained type test, and that's sort of what the district court does. I think that turns Bruin on its head because it sort of looks at step one to say, is this too burdensome? And I think that's both means unbalancing and it's really sweeping in what we're supposed to do at step two of Bruin, which is to say, is the burden that this law imposes too much or too little based on the burdens that were happening at the founding? And so I don't think that's a step one type inquiry. You don't have much time, but how about the intelligible principle standard? Yes. You seem to be proposing something more rigorous than the Supreme Court's current jurisprudence allows. Maybe you could tell us the test you propose. Yes, Your Honor. So I'm arguing in the alternative. So I think first they don't even meet the intelligible principle test. But assuming that you disagree, then I do think because this law defines crimes, a core legislative function, I do think sort of the meaningful constrained language, for example, that was used in Toobie and in this court's case in Amirzami, Didn't we say in Cooper we go by the test until they tell us otherwise? The court said it was doing that in Cooper. I didn't read that to mean that this court must always go by the test. I read it as this question is open and by the Supreme Court and we're not going to resolve it now. But I understand that this court is hesitant to kind of break that new ground, in which case we think that our argument on the intelligible principle test alone stands. And especially with sort of the consumer's research, if the court is moving in a direction of giving that test more teeth in general, then maybe there doesn't need to be sort of a different test in the criminal context. Thank you. We'll get you on. Judge Roth, do you have any other questions? I have nothing further. Okay, great. We'll hear from the Pelley's counsel. Thank you. Good morning. Good morning, Your Honors, and may it please the court. Adam Hallowell for the United States. Claire Fay's Second Amendment challenge fails at each step of Bruin for independent reasons. The simplest reason is at Bruin's second step, where historical tradition confirms that people who export firearms may be required to file and export information with customs. That's a minimal restriction that's analogous to the shall issue requirements for public carry that the Supreme Court implicitly blessed in Bruin. Founding-era embargoes are also historical analogs for the modern export regulations here. Well, you have this letter that your friend points out, and you deal with it as well. But Jefferson de Hammond says, and I quote, our citizens have always been free to make, vend, and export arms. How do we square that with your argument? Yes, I think that letter is, first of all, a reference to American domestic law at the time, statutory law. 1793. It's 1793. I think the historical context of that letter is very important. So Jefferson is Secretary of State in the Washington administration, and he's writing this letter to George Hammond, who is the British minister in the United States. And there's a diplomatic issue in that Britain and revolutionary France are at war at the time, and American citizens are allegedly supplying the French with weapons, with firearms. And the British minister is complaining about this. Jefferson says, Secretary of State Jefferson says for the administration in 1793, that's currently permitted by U.S. domestic statutory law. People who are doing this are not violating American law. Geez, I don't know. You're saying it's permitted now. This says our citizens have always been free to make, vend, and export arms. It always seems a little broader than just for now. Well, then you look at the 1794 Act, which is passed just one year after that letter and only three years after the Second Amendment was ratified, and that bans the export of muskets, pistols, cutlasses, et cetera, for a period of one year. And that's driven by exactly the same diplomatic issue, which is the same diplomatic issue that the export requirements, as well as the arms embargo on Haiti, are trying to address here. The shipment of arms outside the United States has major impact on international relations, foreign relations, national security, that purely domestic transfer, domestic possession of arms would not have. And so whatever was the situation in 1793, Congress has allowed the third Congress, again, shortly after the Second Amendment is drafted and ratified, to limit the international export of those arms. And so that, I think, supports us both at step one of Bruin, because the letter doesn't say anything about what the word keep means, and at step two in showing that there are different rules for foreign relations, not just from that letter, not just from the May 1794 Act, but from the other embargoes that we've cited, too, in our brief, not all of which are time-limited, not all of which are directed at a particular country, not all of which are in time of war or directly linked to American interests. I guess I'd point to the whole scope of foreign arms embargoes that the Supreme Court talked about in the Curtis Wright opinion, and the arms embargo there was about a war between Bolivia and Paraguay. And that, both from a non-delegation perspective and from a Second Amendment perspective, was not seen as being problematic under American law because of the administration's, and particularly the executive's, prerogative to control and limit the shipment of arms outside the jurisdiction. But even beyond that, we're not, because of Mr. Claire Faye's limited plea, we're not talking about an arms embargo, a complete ban on exporting the arms. We're just talking about the information, the export information that needed to be filed in this case, as the questioning touched on before. And just to run through exactly what that looked like, I mean, 13 U.S. Code 305 is the object of this conspiracy. Section 301 says the Secretary of Commerce can collect information about exports. If you look at the foreign trade regulations, this is 15 CFR 30.6, we allude to this in our brief. The required information includes naming the party in interest, naming the consignee in the foreign country, the classification and the description of the item, the value. These are standard conditions for any export shipment, not just firearms. These are general requirements for shipments, subject to certain exceptions. But there's no history that Mr. Claire Faye has pointed to of firearms being considered to be exempt from these regulations under the Second Amendment. And if you look at customs regulations, you know, those are historical analogs dating back to the founding era, dating back centuries throughout human history of jurisdictions being able to control, keep track of the shipment of any goods out from or into their territory. It's, again, a strong historical analog here, historical twins, and not just a historical analog. Turning to Bruin Step 1 to discuss that, it's also clear that Mr. Claire Faye's conduct here is not subject to the, does not fall within the text of the Second Amendment. And I guess I'd first of all point out that as an as-applied challenger, he has the burden of establishing the particular factual circumstances of his conduct, his primary conduct that he claims is constitutionally protected. We have that from the Markavich case. And I just point out, there's nothing in the record here because Mr. Claire Faye did not come forward with any evidence. He did not submit any affidavits. He did not ask for a hearing. And even in the briefing below, he said in his reply brief, this is at appendix pages 126 to 27, that the district court did not need to resolve any factual disputes in order to resolve this case. So that's the way Mr. Claire Faye framed his motion. So that means the court really, first of all, should not give any weight to his claim that he personally intended to possess these firearms in Haiti. But even if you did do that, and even if you disregarded the evidence that we proffered, pointing out that his uncles and cousins admittedly possessed those firearms, he did not possess those firearms in Haiti. He did not visit often. And again, based on his statements in the plea, Mr. Germain, the counterparty in New York State, had driven from New York City to the Pittsburgh area for both of these firearm purchases, purchases of nine 9mm firearms, and then immediately returned to New York, apparently suggested by cell phone data. That's what the record suggests about the facts here. But even just looking to the conduct of shipping arms overseas, it's odd to say that keeping arms includes that conduct, because keeping, as the Supreme Court said in Heller, quoting Noah Webster, means holding or retaining in one's power or possession. If you are divesting yourself of firearms, sending them to a place outside the jurisdiction where you have very little control over them, that cannot reasonably be called keep, we would say. So you've pointed out, I guess, that there's nothing in the record about what his intent was about these firearms. He never attempted to prove that. There were unsworn statements in his briefing, but he never asked for a hearing on that point. And again, all of the evidence suggests that even if, which there's no evidence of, even if he intended to have some connection to those firearms in the future, that would not have been exclusive to the other people, his relatives, not U.S. citizens, who lived in Haiti and who received the firearms. So that's the conduct we have here. So a licensed firearm dealer doesn't keep arms in the sense you're talking about either. Correct. But his conduct is protected under the Second Amendment, right? It is as an ancillary conduct, we would say, ancillary conduct to the possession of his buyers, assuming that those transfers happen within the United States and that they follow generally applicable laws. And I guess your friend is making kind of a variant of that argument. I'm not sure, I'm not sure the parallel holds when you're talking about possession of firearms outside of the United States as the conduct that his domestic conduct is ancillary to. The domestic conduct here, which they make much of, happened in the United States, but that's just a means to an end. The end is to get these firearms into another country, into Haiti, where people who would possess them, certainly his uncles and cousins, don't have Second Amendment rights to possess them in Haiti. We would argue that the pure possession by Clairefeuille of these firearms is not protected by the Second Amendment in Haiti. Again, kind of for similar reasons that we were talking about with the historical context before, you should not read keep and bear arms to extend extraterritorially just because of the imposition that that would put on other countries in the diplomatic context. That's not a fair reading. They have not pointed to any cases where either from the Second Amendment conduct or the First Amendment conduct, courts have said that those amendments apply to purely extraterritorial conduct. And the Verdugo-Orquidez case on the Fourth Amendment shows the Bill of Rights generally is not read in that extraterritorial way. So whatever the scope, I don't think this court needs to get into, in this case, the scope of whether keeping and bearing arms would cover domestic transfers, commercial sales. It's clear that it does not cover the conduct here, certainly not the conduct as Clairefeuille has framed it. Does it matter on an analytical basis whether Clairefeuille is a U.S. citizen or not? I don't think that it does in terms of the primary conduct of possessing firearms in Haiti that we are talking about. Because even if he is a U.S. citizen, he is a U.S. citizen. We know that. He's a naturalized citizen. Even then, his conduct of possessing the firearms in Haiti, we argue for all the reasons we've given, is not protected by the Second Amendment. Maybe you could deal with the intelligible principle test. Yes, exactly, Your Honor. And perhaps respond to your adversary's, I guess, view about how that can be dealt with in this case. Correct. That principle, the Arms Export Control Act satisfies the intelligible principle test and so satisfies the non-delegation doctrine here. We read Cooper as saying that this court does apply the intelligible principle test in the criminal context. I mean, Cooper did not address any higher test that might be required. It just affirmed based on the intelligible principle test. So that's binding on this panel. And here, the intelligible principle test and, indeed, any higher test, like meaningfully constrains from Amornosmy, it is satisfied. The act meets the general principle. But you're saying there is no higher test. There is no higher test. Even if they're correct that the meaningfully constrains test applies, we would meet that, too. But just to walk through the intelligible principle test, the act sets forth a general principle. It's that decisions about what is or is not a defense article should be made by the president in furtherance of world peace and U.S. security and foreign policy. And those are areas, obviously, that are very strongly constrained within the president's discretion, carrying on foreign policy, negotiating with foreign countries, commander-in-chief policy. These are reasons why the Supreme Court has said generally the principle doesn't have to be as focused in the foreign policy context. And then there are also boundaries to the policies. The goods have to be defense articles, and the boundaries are that they're subject to export controls. It's not a broader regulation of any other transaction, which might be permissible, as, indeed, we saw in the IEEPA context in Amornosmy. And then there's constraint in that the president has to report to Congress, provide 30 days' notice before removing any items. All of these are reasons why the only three circuits that have decided this issue, that have addressed it, have held that the AECA does satisfy the intelligible principle test. And, again, this is an area that falls within the president's foreign policy authority. I think we are in Youngstown Category 1 because it's not only the act of Congress that is giving the president some authority in this area. It's also inherent powers like commander-in-chief to decide what defense articles, if they were exported, could be a threat to American security and in carrying on negotiations with foreign countries. Those are reasons, and for similar reasons in Amornosmy, this court said that even if meaningfully constraints applies, which I think was just assumed in that case, it would justify the foreign policy-related act there, and the same reasoning would apply here. I guess the act says that the general policy is world peace, and it's the security and foreign policy of the U.S., right? Yes. All right. Do you have anything else? Anything more, counsel? No further questions. If there are no further questions, we'd ask the court to affirm. Okay, great. Judge Roth, do you have anything more? I have nothing further. Thank you. Okay. Thank you. Thank you. All right. We'll hear a rebuttal. Thank you, Your Honor. Just a couple points. On the facts and the relevance of any factual disputes, if you think that transfer is only covered if he was going to keep the firearms at his home in Haiti, then I think you can do what the government is asking you to do, which is to take the allegations in the indictment as true and recognize that the indictment sweeps in that conduct. Again, the indictment just says he shipped firearms. The presumption should be that he was shipping them to keep them somewhere. Certainly they have not alleged anything in the indictment or otherwise that there was a non-commercial relationship. But don't you concede that he didn't possess them in Haiti? Others did? He has not yet possessed them in Haiti, but, of course, after he shipped them, he was federally investigated and then indicted, so there was no opportunity for him to do so. If Your Honor thinks that this question turns on what his intent was, then we would ask for a remand to be able to put on evidence to show that. Of course, that raises a host of other problems, so we think the better course is to hold that the indictment sweeps in that conduct. The government hasn't said otherwise, and Mr. Clairfay is entitled to defend himself on the indictment as it is, taking those facts as true. The government would never have to prove anything about his motive or intent. I also wanted to address the history. I heard the government to say that the purpose that's shared between the historical laws and the modern laws is the impact on international relations. I think that is far too broad. I think it's even broader than what the court rejected in range when it said that people who were disloyal could not now justify 922 G1, and, of course, these were temporary commercial restrictions. I think the government said there was one that was not temporary. They only point to four, I think, on pages 27 and 28 of their brief. The one that was not temporary, I believe, was the 1807 one, and that one was highly unpopular and was repealed just within a few years and was directly, again, linked to American safety. It was an embargo on ships because ships were being attacked by British and French forces and all their goods taken off. I also want to emphasize, Your Honor, that free to make and sell arms is more than just sort of this idea about a commercial sort of right. Part of the revolution was the frustration with the inability to export firearms. That was a big part of what colonists did. And so because the Second Amendment codified a preexisting right and not something that it needed to spell out, it should be assumed that those sort of ordinary things that people felt like they should be able to do with their firearms, including selling domestically and exporting, was covered by the text, especially when there's nothing indicating that it's excluded. We would ask that Your Honors reverse and remand. Thank you, Counsel. Do you have any other questions for Judge Royce? Well, I don't. I'm sorry? No, I have no other questions. Okay, great. Thank you. Thank you, Counsel. We thank Counsel for their excellent briefing and oral argument today. We'll take the case under advisement.